# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

DEBORAH L. THIEME-KNIGHT,

       Plaintiff,

v.                                    Case No.  3:18-cv-658-J-MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

       Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative

decision denying her application for a period of disability and disability insurance

benefits ("DIB").  A hearing was held before an Administrative Law Judge ("ALJ")

on October 19, 2010, at which Plaintiff was represented by counsel.  (Tr. 70-

127.)  On January 13, 2011, the ALJ found Plaintiff not disabled from March 30,

2006, the alleged disability onset date, through September 30, 2010, the date

last insured.[2]  (Tr. 133-41.)  On February 10, 2012, the Appeals Council vacated

the ALJ's January 13, 2011 decision and remanded the case to the ALJ for

---

[1] The parties consented to the exercise of jurisdiction by a United States
Magistrate Judge.  (Doc. 14.)

[2] Plaintiff had to establish disability on or before September 30, 2010, her date
last insured, in order to be entitled to a period of disability and DIB.  (Tr. 133, 1289.)

further proceedings.[3] (Tr.149-51.) In accordance with the remand order, the ALJ

held supplemental administrative hearings on February 21, 2013 and May 6,

2013.[4] (Tr. 47-127, 1470-91; Tr. 13-46, 1492-1525.) On August 9, 2013, the ALJ

issued a second decision finding Plaintiff not disabled from March 30, 2006

through September 30, 2010, the date last insured. (Tr. 156-71.) On April 20,

2015, the Appeals Council denied Plaintiff's request for review of the ALJ's

August 9, 2013 decision. (Tr. 1352).

Thereafter, Plaintiff filed a federal civil complaint, and, on January 5, 2016,

this Court remanded the case to the Commissioner.[5] (Tr. 1347-48.) On March

26, 2016, the Appeals Council vacated the ALJ's August 9, 2013 decision and

remanded the case to a different ALJ with instructions to, *inter alia*, fully consider

---

[3] On remand, the ALJ was directed to evaluate, *inter alia*, the nature and severity of Plaintiff's "mental impairments and their impact on her functional ability during the period at issue." (Tr. 150.)

[4] The ALJ continued the February 21, 2013 hearing to allow for a consultative psychological examination of Plaintiff. (Tr. 57-64.) Specifically, the State agency psychological expert, Michael Craig Rabin, Psy.D., testified at the February 21, 2013 hearing that Plaintiff's doctor wanted neuropsychological testing done, "and mentioned several times it had to be done, but [Plaintiff] had no insurance and no way of obtaining the testing. And apparently Social Security did not send her out for a CE [consultative examination] or IQ testing or memory testing." (Tr. 58.) On March 28, 2013, Raena Baptiste-Boles, Psy.D., a State agency consultative psychologist, examined Plaintiff and completed a Psychological Evaluation (Tr. 1250-54) and a Medical Source Statement of Ability to do Work-Related Activities (Mental) (Tr. 1255-57).

[5] This Court remanded the case upon the Commissioner's unopposed request for remand under sentence four of 42 U.S.C. § 405(g), with directions to the ALJ: "to fully consider the March 18, 2013[] opinion of Raena Baptiste-Boles, Psy.D., pursuant to the provisions of 20 C.F.R. § 404.1527 and Social Security Rulings 96-2p and 96-5p, and explain the weight given to this evidence and the reasons for doing so." (Tr. 1347-51 (alterations omitted).)

the opinion of Raena Baptiste-Boles, Psy.D., a State agency consultative examiner, and, "[i]f warranted, [to] give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale[,] with specific references to evidence of record[,] in support of the assessed limitations."  (Tr. 1341-42.)  On December 5, 2016, the new ALJ held another hearing and, on January 13, 2017, issued a decision finding Plaintiff not disabled from March 30, 2006 through September 30, 2010.  (Tr. 1289-1309, 1321-38.) The Appeals Council declined to "assume jurisdiction" over Plaintiff's request for review of the ALJ's January 13, 2017 decision.  (Tr. 1279-80.)

Plaintiff is appealing the Commissioner's final decision that she was not disabled from March 30, 2006 through September 30, 2010.  Plaintiff has exhausted her available administrative remedies and the case is properly before the Court.  (*See* Tr. 1279-82.)  The Court has reviewed the record, the briefs, and the applicable law.  For the reasons stated herein, the Commissioner's decision is **REVERSED and REMANDED**.

## I.    Standard

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a

conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.    Discussion

Plaintiff argues that a remand is necessary because the ALJ erred by failing to properly credit the medical opinions of the State agency testifying psychological expert, Dr. Rabin, and the consultative psychological examiner, Dr. Baptiste-Boles, in assessing Plaintiff's residual functional capacity ("RFC").  Defendant responds that the ALJ properly evaluated the medical source opinions in assessing the Plaintiff's RFC prior to the expiration of her insured status.

### A.    Standard for Evaluating Opinion Evidence and Subjective Symptoms

The ALJ is required to consider all the evidence in the record when making a disability determination.  *See* 20 C.F.R. § 404.1520(a)(3).  With regard to

medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6). "However, the ALJ is not required to explicitly address each of those factors. Rather, the ALJ must provide 'good cause' for rejecting a treating physician's medical opinions." *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011) (per curiam).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518

(11th Cir. 1984) (per curiam), 20 C.F.R. § 404.1527(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008). Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec. Admin.*, 2007 WL 708971, *2 (11th Cir. Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam); *see also* SSR 96-6p (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources). While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision. SSR 96-6p.

When a claimant seeks to establish disability through her own testimony of pain or other subjective symptoms, the Eleventh Circuit's three-part "pain standard" applies. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam). "If the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so." *Id.*

The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Id.*

Once a claimant establishes that his pain is disabling through objective medical evidence from an acceptable medical source that shows a medical impairment that could reasonably be expected to produce the pain or other symptoms, pursuant to 20 C.F.R. § 404.1529(a), "all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the medical signs and laboratory findings in deciding the issue of disability," *Foote*, 67 F.3d at 1561.

### B. Relevant Medical Opinions

#### 1. Dr. Rabin

Michael Rabin, Ph.D., a licensed clinical and forensic psychologist designated by the Commissioner as a medical expert, testified at the hearings on February 21, 2013 (Tr. 1412-69) and May 6, 2013 (Tr. 1470-1525). At the February 21, 2013 hearing, Dr. Rabin summarized Plaintiff's mental impairments in the medical record during the adjudicative period as follows:

[Plaintiff] was originally seen for chronic pain . . . [but] in July of [20]08, she was seen for post-concussive syndrome, though the CT scan at the time was normal. . . . [T]wo months later they took another MRI of the brain, and that was mildly abnormal without any specific problems noted. She also ha[d] been diagnosed with anxiety, post[-]traumatic stress disorder, and depression over the years. And there were indications of some neurological issues as

well, [including] Chiari I malformation. When she was seen by the CE [consultative examiner] in [20]09, he saw her with a[n] anxiety disorder due to medical conditions and psychological factors affecting [her] medical condition. [The CE] didn't specify which psychological factors were involved. The next part of interest is [evidence from] Neurological Partners in [Exhibit] 22F as of May 10th when they found a post[-]traumatic concussive syndrome and persistent cognitive changes due to the post[-]traumatic concussive syndrome. . . . MRIs have shown mild abnormalities with the Chiari I syndrome. And also[,] they include a suspected partial seizure disorder with memory loss[], and she showed cognitive problems all through . . . the case, particularly problems with short-term memory and problems with executive functioning with the ability to carry out and to complete tasks that [she] start[s]. In the past, she's also several times denied the experience of anxiety and depression and mainly focused on her pain and her memory problems.

(Tr. 1479-80.) Based on these findings, Dr. Rabin diagnosed Plaintiff with "cognitive disorder NOS, pain disorder with both psychological factors and a medullar [inaudible] condition, and anxiety and depressive disorder NOS." (Tr. 1480.) Dr. Rabin also opined that Plaintiff's impairments had a mild effect on her activities of daily living, a moderate effect on her social functioning, and a marked effect on her pace, persistence, and concentration, but noted that there had been no periods of decompensation. (*Id.*) Dr. Rabin further noted that while Plaintiff did not meet the listings, he opined that Plaintiff would have great difficulty in completing "the average workday in terms of maintaining attention and time on task long enough in the day due to the pull of . . . her mental symptoms." (*Id.*)

However, given that neuropsychological testing had not been conducted due to Plaintiff's lack of insurance and funds, despite Plaintiff's medical providers' finding that such testing was necessary, Dr. Rabin recommended that "it would

be best" if neuropsychological tests, including the WAIS, Wechsler Memory tests, TRAILS, Wisconsin Card Sort Test, and the REY Memory Test or the TOMM, were conducted.[6] (Tr. 1481-82.) The ALJ continued the February 21, 2013 hearing to allow for Plaintiff's evaluation (psychometric testing) by a State agency consultative examiner, which was conducted on March 18, 2013 by Dr. Baptiste-Boles. (Tr. 1504; Tr. 1250-57.)

At Plaintiff's supplemental hearing on May 6, 2013, Dr. Rabin testified that, although not all of the recommended tests had been conducted, the WAIS and the Wechsler Memory tests provided enough information for Dr. Rabin to render an opinion as to Plaintiff's intelligence and memory functioning. (Tr. 1504-05.) Dr. Rabin opined that the tests showed "a severe verbal learning problem and a problem with verbal memory[,]" but acknowledged that testing regarding Plaintiff's executive functioning had not been conducted. (Tr. 1505.) Dr. Rabin noted that Plaintiff's memory problems were deemed mild. (Tr. 1507.) Dr. Rabin continued:

> [Plaintiff] has a verbal comprehension . . . in the mildly mentally retarded range, while her other scores are in the borderline range[,] except for her working memory . . . where she scored in the below average range. Looking at the scores themselves, the scores are consistent within [each] category, which indicate[s] [they are] probably accurate. And she showed very poor scores on all aspects of verbal comprehension, using language, understanding language,

---

[6] Dr. Rabin noted that for these type of neurological conditions, "neurologists typically hire a neuropsychologist to do testing for them because the brain scans will not pick up executive functioning loss, memory loss, or other types of psychological factors." (Tr. 1483.)

and remembering language[,] while her other scores are somewhat better.

. . .

In terms of her memory functioning[,] she has a very low score in auditory memory, which means that she has a problem with meaningful material. She cannot remember meaningful material very well compared to most people. Looking at her scores . . . meaningful material is not an aid to her memory. . . . Her visual memory is normal. Her working memory is normal. Her delayed memory . . . is also very poor. She would have [difficulty] remembering work procedures and could only deal with the most simple of work procedures and routine work which [would] not change over time.

(Tr. 1508-09.) Dr. Rabin opined that Plaintiff should have "no contact with the general public because she may get confused or get the wrong information[,]" but placed no limitations on contact with supervisors or co-workers. (Tr. 1514-15.)

Dr. Rabin then testified that he had reviewed the psychometric testing performed by Dr. Baptiste-Boles, discussed *infra*, and that he agreed with her findings, except that in terms of Plaintiff's diagnosis of Major Depressive Disorder, Dr. Rabin opined that it was not clear if Plaintiff suffered from "a major depression, a bipolar, or dysthymic disorder." (Tr. 1509-11.) Dr. Rabin opined that, "[a]s Dr. Bowles [sic] said in her report, and I agree in my earlier testimony, given her multitude of problems, it's very difficult [inaudible] [to complete] a 40-hour workweek and do the work, [and] be on task[,] for 90 percent of the day or more. That's . . . the issue I had, what Dr. Boles has, with this case." (Tr. 1515.) Dr. Rabin testified that Plaintiff's impairments had a mild effect on her activities of daily living and social functioning, but had a marked effect on pace and

concentration, with no episodes of decompensation.  (Tr. 1519.)  He concluded that:

> given all of [Plaintiff's] medical problems and emotional problems, one of my diagnoses before was pain disorder with both psychological and medical issues.  I think that she would miss too much time off of work or be off task too often because of the pull of her psychological problems and the pull of her pain disorder and everything else.  That's what I'm saying.  That's what I said the last time as well.

(Tr. 1520.)

On May 22, 2013, Dr. Rabin also submitted a post-hearing Mental RFC Questionnaire.  (Tr. 1275-78.)  In the Mental RFC Questionnaire, Dr. Rabin identified Plaintiff's signs and symptoms of anhedonia or pervasive loss of interest in almost all activities, decreased energy, generalized persistent anxiety, somatization unexplained by organic disturbance, mood disturbance, difficulty thinking or concentrating, memory impairment, and psychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.  (Tr. 1275-76.)  Dr. Rabin also opined that Plaintiff would have noticeable difficulty (meaning that she would be unable to perform a designated task or function more than 20% of the workday or workweek) performing work-related activities, involving understanding and remembering detailed instructions, carrying out detailed instructions, and traveling to unfamiliar places or using public transportation.  (Tr. 1276-77.)

Dr. Rabin also concluded that Plaintiff would have noticeable difficulty (from 11% to 20% of the workday or workweek) with the following: remembering work-like procedures; maintaining regular attendance; performing at a consistent pace without an unreasonable number and length of rest [periods]; responding appropriately to changes in a routine work setting; dealing with normal work stress; and dealing with stress of semi-skilled and skilled work. (*Id.*) He also determined that Plaintiff would have noticeable difficulty (up to 10% of the workday or workweek) performing the following: understanding and remembering very short and simple instructions; carrying out very short and simple instructions; completing a normal workday and workweek without interruptions from psychologically based symptoms; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; interacting appropriately with the general public; and maintaining socially appropriate behavior. (*Id.*) Dr. Rabin concluded that Plaintiff's impairments were expected to last at least 12 months and that Plaintiff was not a malingerer. (Tr. 1277.)

## 2. Dr. Baptiste-Boles

On March 18, 2013, Dr. Raena Baptiste-Boles conducted a psychological examination of Plaintiff. (Tr. 1250-54 (Psychological Evaluation); Tr. 1255-57 (Medical Source Statement of Ability to do Work-Related Activities (Mental)).) Dr. Baptiste-Boles noted as follows:

> [Plaintiff] reported current mental health conditions being remarkable for depression and anxiety. The following symptoms of depression were endorsed: crying spells, insomnia, worthlessness, feeling of loss (e.g.[,] son in prison, mother's death, and dad's death), and irritability. She stated that symptoms worsened after falling in a store in 2008. Onset was reported 6 years ago.
>
> . . .
>
> Current mood was reported as "sad" and affect appeared consistent with mood. She reported that the present conditions [were] impacted by medical condition and economic difficulties. . . .
>
> . . .
>
> The current level of mental health symptoms would be best characterized as moderate.
>
> . . .

(Tr. 1251.)

Dr. Baptiste-Boles then conducted a Mental Status Evaluation and noted,

*inter alia*, that Plaintiff "demonstrated adequate attention and concentration as

she was able to attend to the evaluator's questions throughout the interview

without distraction and was able to complete tasks of alphabetic and numeric

reiteration without errors." (Tr. 1252.) Dr. Baptiste-Boles further noted that:

> [Plaintiff's] flexibility appeared adequate as she was able to spell the word "world" backwards and complete simple tasks of serial calculations without errors. [Plaintiff] did not display any significant difficulties in processing speed. Receptive language appeared to be adequate as she was able to complete all verbal commands presented without errors and expressive language appeared to be adequate as she was able to complete all written tasks presented without errors. Immediate memory appeared to be mildly impaired as she was able to recall 2 of 3 words immediately after presentation and recent memory appeared to be mildly impaired as she was able to recall 2 of the 3 words presented after a short delay. Remote memory appeared to be adequate as she was able to recall specific details regarding past autobiographical events. She demonstrated adequate mental computations as she was able to complete basic verbal arithmetic problems without errors.

> [Plaintiff] displayed adequate social skills.  Abstract reasoning
> appeared adequate.  Judgement related to self-care and social
> problem-solving appeared to be adequate . . . . Insight appeared to
> be adequate based on the clinician's observations.  Overall
> intelligence was approximated as being average based on the
> observed vocabulary, usage, and fund of general information.
> General thought processes appeared to be coherent, logical, and
> goal oriented.  Thought form and content appeared to be age
> appropriate and unremarkable.  She denied having any history of
> suicidal or homicidal attempts. . . .

(*Id.*)

Dr. Baptiste-Boles also performed the Wechsler Adult Intelligence Scale (WAIS-IV) and the Wechsler Memory Scale (WMS-IV) tests.  (Tr. 1252-53.)  With respect to the WAIS-IV, Plaintiff scored as follows: Extremely Low in Verbal Comprehension; Borderline in Perceptual Reasoning, Processing Speed, and in Full Scale IQ; and Low Average in Working Memory.  (Tr. 1253.)  Dr. Baptiste-Boles noted that Plaintiff's Full-Scale IQ score of 70 placed her in the "Borderline range of intellectual functioning" and that Plaintiff's scores did not demonstrate any "significant relative strengths or weaknesses."  (*Id.*)  With respect to the WMS-IV, Plaintiff scored as follows: Extremely Low in Auditory and Delayed Memory Index; Low Average in Visual Working and Immediate Memory Index; and Average in Visual Memory Index.  (*Id.*)  Dr. Baptiste-Boles noted that Plaintiff "present[ed] significant difficulties recalling verbal information that [was] conceptually organized and semantically related" and that these scores "suggest[ed] a significant difficulty . . . regarding declarative memory."  (Tr. 1254.)

Dr. Baptiste-Boles diagnosed Plaintiff with: Major Depressive Disorder, Recurrent, Moderate, Anxiety Disorder NOS, and Cognitive Disorder NOS (Axis I); Arnold Chiari Malformation Type I, seizures, white mass in frontal lobe, diverticulitis, memory loss, severe headaches, hand pain and stiffness, and sensory loss of right side of the body from waist to head (Axis III); Occupational and Economic problems (Axis IV); and a Current GAF of 59 (Axis V). (Tr. 1254.) In her summary, Dr. Baptiste-Boles opined that Plaintiff's "mental health symptoms based on report [sic] and clinical observations appear to be moderately impacting activities of daily living, vocational performance, and interpersonal interactions. Current prognosis for [Plaintiff] is fair. In regards to financial management, [Plaintiff] is not recommended to manage benefits and financial decisions due to reported memory deficits and confusion." (*Id.*)

Dr. Baptiste-Boles also found that Plaintiff's ability to understand, remember, and carry out instructions was affected by her impairments. (Tr. 1255.) Dr. Baptiste Boles opined that Plaintiff had marked limitations in carrying out simple instructions; understanding and remembering complex instructions; carrying out complex instructions; and in the ability to make judgments on complex work-related decisions. (*Id.*) She also found that Plaintiff had moderate limitations in understanding and remembering simple instructions and in the ability to make judgments on simple work-related decisions. (*Id.*) Dr. Baptiste-Boles opined:

> Given [the] memory problems identified by score[]s obtained in standard testing, claimant will present difficulties related to remembering instructions and subsequently carry[ing] them out. [Plaintiff] has problems related to semantic declarative memory. [] [Her symptoms[,] such as depressed mood, [low] [e]nergy, and anhedonia[,] will interfere with claimant's ability to perform in a job.

(*Id.*)

Dr. Baptiste-Boles also opined that Plaintiff's impairments would interfere with her ability to interact appropriately with supervisors, co-workers, and the public, as well as with her ability to respond to changes in routine work settings. (Tr. 1256.) She found that Plaintiff had moderate restrictions in responding appropriately to unusual situations and changes in routine work settings. (*Id.*) As a result of these findings, Dr. Baptiste-Boles concluded that "[c]ognitive difficulties related to memory will interfere with the claimant's ability to incorporate changes in a routine work setting. Anxious mood and difficulties in managing social situations will hinder her ability to relate to others at a work[]place." (*Id.*)

### C. The ALJ's January 13, 2017 Decision

At step two of the five-step sequential evaluation process,[7] the ALJ found that Plaintiff had the following severe impairments: "a history of possible diverticulitis; a history of Arnold-Chiari Type I malformation[8]; a history of

---

[7] The Commissioner employs a five-step process in determining disability. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v).

[8] An Arnold-Chiari I malformation is characterized as a structural defect in the base of the skull and cerebellum.

headaches; a history of abdominal pain with uterine fibroids and later

hysterectomy; a history of musculoskeletal pain secondary to a prior slip and fall

accident."[9]  (Tr. 1291.)  At step three, the ALJ found that Plaintiff did not have an

impairment or combination of impairments that met or medically equaled the

severity of one of the listed impairments.  (Tr. 1294.)

The ALJ then found that, through the date last insured, Plaintiff had the

RFC to perform light work, but with the following limitations:

> [L]ift[] up to 20 pounds occasionally; lift/carry up to 10 pounds
> frequently. Stand[]/walk[] for about 6 hours and sit[] for up to 6 hours

---

Normally the cerebellum and parts of the brain stem sit above an opening in the skull that allows the spinal cord to pass through it (called the foramen magnum). . . .  Chiari malformations may develop when part of the skull is smaller than normal or misshapen, which forces the cerebellum to be pushed down into the foramen magnum and spinal canal.  This causes pressure on the cerebellum and brain stem that may affect functions controlled by these areas and block the flow of cerebrospinal fluid (CSF)—the clear liquid that surrounds and cushions the brain and spinal cord. . . . Chiari Malformation Type I [] happens when the lower part of the cerebellum (called the cerebellar tonsils) extend into the foramen magnum. . . .

*See* https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Chiari-Malformation-Fact-Sheet (last visited September 25, 2019).

[9] As to Plaintiff's diagnosis of suspected partial complex seizures, the ALJ found that there was no objective evidence of a seizure disorder and that the medical records and treatment history did "not establish her history of suspected partial complex seizures as a severe impairment."  (Tr. 1292.)  The ALJ found Plaintiff had the following non-severe impairments: anxiety disorder due to musculoskeletal system; psychological factors affecting medical condition; and stress-related physiological response affecting neurological condition.  (*Id.*)  The ALJ also rejected Plaintiff's diagnoses of major depressive disorder, anxiety disorder NOS, and cognitive disorder because these diagnoses followed a consultative examination in March 2013, which was after the date last insured; Plaintiff purportedly denied depression and anxiety in 2010 and 2011; and the "mental symptomology (depression and anxiety) in 2013 [did] not establish disability as of the date last insured (or years prior [to] 2010)."  (Tr. 1293.)  The ALJ found that Plaintiff's cognitive disorder was only mild.  (*Id.*)

in an 8-hour workday with normal breaks. In addition, the claimant is limited to no climbing of ladders, ropes, or scaffolds. The claimant is limited to frequent climbing of ramps or stairs, frequent balancing, frequent stooping, frequent kneeling, frequent crouching, and frequent crawling. The claimant must avoid all exposure to hazards such as driving automotive equipment, working in proximity to bodies of water, use of moving machinery, or exposure to unprotected heights. The claimant is limited to occupations that do not require complex written or verbal communication or frequent verbal communication.

(Tr. 1295.) In making these findings, the ALJ considered Plaintiff's statements and testimony, the objective medical evidence, as well as the opinions of treating, examining, and non-examining sources. (Tr. 1295-1307.)

The ALJ adopted and incorporated the summary of Plaintiff's testimony[10] from the previous ALJ's January 13, 2011 decision, as follows:

The claimant testified she ha[d] headaches that shoot pain down into her back. She testified no one[,] other than her husband or her son[,] [had] ever witnessed her having a seizure. She testified no physician ha[d] ever asked her to keep a seizure diary. The claimant stated that she ha[d] not had her blood levels checked to determine if her medication is therapeutic. She further testified she [was] not seeing any doctors on a regular basis because she [could not] afford to do so. The claimant testified she now [got] her medications from the local public health department. Exhibit 3A/10.

(Tr. 1296.) The ALJ also adopted the following summary of Plaintiff's testimony from the previous ALJ's August 9, 2013 decision:

_____

[10] Plaintiff declined to give further testimony at the December 5, 2016 supplemental hearing due to memory problems and, instead, relied on her prior testimony provided during the October 19, 2010 hearing. (*See* Tr. 1326 ("Her testimony back then may be more relevant than it is now, just because we may get a lot of . . . [']I'm having a difficult time remembering.['] So we at least have the testimony that she offered very close in time to her date last insured and her onset date in the previous transcripts."); *see also* Tr. 1520-22 (waiving additional testimony by Plaintiff at the May 6, 2013 hearing).)

The claimant allege[d] an inability to work due to the presence of an Arnold-Chiari malformation Type [I], seizures, a mass on [the] right frontal lobe of the brain, diverticulitis, memory loss, severe headaches, loss of use of the right side and severe pain in the right elbow. The claimant reported that she ha[d] to lie down for extended periods of time. The claimant noted that she ha[d] lost feeling on the right side from her face to her waist; she ha[d] mini-seizures; her diverticulitis cause[d] severe stomach and abdominal pain; she ha[d] tumors in her uterus. The claimant stated that she [was] in constant pain. The claimant reported that she [could not] lift due to pain in the back and neck. The claimant further noted that she ha[d] a hard time concentrating and remembering anything. The claimant allege[d] that she [was] unable to stand, sit or [lay] down for any length of time. The claimant noted that she [could] hardly use her right arm due to severe elbow pain (Exhibit 2E). Exhibit 5A/10.

(*Id.*)  The ALJ then found that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,] . . . [her] statements concerning intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  (*Id.*)

In assessing Plaintiff's RFC, the ALJ adopted the medical summaries contained in the January 13, 2011 and August 9, 2013 ALJ decisions, and noted the following:

As stated in the prior [ALJ's] decision at Exhibit 5A: "The claimant has seen Dr. James Connor for quite a few years as her primary care physician (Exhibits 1F, 2F, 8F and 34F)[,] mainly for routine medical problems.  There is no indication in the record that this long time treating physician noticed any problems with the claimant's cognition or memory prior to the lapse of her date last insured (DLI). The doctor thought that the claimant might have some diverticulitis; however, an October 2006 abdominal x-ray was unremarkable (Exhibit 2F/1-2) and a prior CT scan of the abdomen in August 2005 was only noteworthy for some ovarian cysts (Exhibit 3F/43)."  The claimant received a conservative treatment regimen from this

primary care treating physician, which included a narcotic pain
medication regimen (including Percocet, and later Lortab). However,
Dr. Connor's clinical exam findings, as well as his progress notes do
not document significant findings indicative of disabling limitations for
12 continuous months, or an inability to work in any capacity at SGA
levels.[11]

(Tr. 1297.)  The ALJ then noted negative findings following various X-rays, but

stated that a "February 2008 CT [scan] of the abdomen and pelvis showed some

possible uterine fibroids[,]" even though "[a] later similar exam performed well

after the DLI in April 2011 did not show any significant abnormalities."  (*Id.*)  The

ALJ also noted that Plaintiff had a hysterectomy in October 2009 "with

improvement."  (*Id.*)  Following Plaintiff's slip and fall at a retail store in July 2008,

the ALJ noted that Plaintiff had normal X-ray results and a normal CT scan of the

head, but noted that:

> An August 2008 MRI of the right elbow showed some intra-articular
> effusion (Exhibits 4F/4) and an MRI of the lumbar spine only
> demonstrated some mild facet arthropathy at the L4 to S1 levels
> (Exhibit 4F/3).  A cervical spine and brain MRI done at the same
> time showed evidence of a cervical syrinx[12] consistent with a

---

[11] Although the ALJ does not mention this, however, the record reflects that in
2006, Dr. Connor determined that Plaintiff's case was too complicated and encouraged
Plaintiff to follow up with another doctor. (Tr. 789 ("I find that your case is too
complicated for me to follow-up.  Thus[,] we encourage you to find another physician to
follow-up with your care.").)  Moreover, Dr. Connor also noted Plaintiff's difficulty in
obtaining necessary medical treatment due to lack of medical insurance and financial
difficulties. (*See, e.g.*, Tr. 618, 742, 744.)

[12] Syringomyelia is a disorder associated with an Arnold Chiari malformation in
which a syrinx, a tubular cyst filled with cerebrospinal fluid (CSF), forms within the
central canal of the spinal cord.  *See* https://www.ninds.nih.gov/Disorders/Patient-
Caregiver-Education/Fact-Sheets/Chiari-Malformation-Fact-Sheet (last visited
September 19, 2019).  "The growing syrinx destroys the center of the spinal cord,
resulting in pain, weakness, and stiffness in the back, shoulders, arms, or legs.  Other

possible Arnold-Chiari I malformation (Exhibit 4F/1-2), which was confirmed on a later November 2010 MRI of the brain (exhibit 28F). September 2008 nerve conduction studies performed by Dr. Kilgore to check for any ulnar nerve problem or carpal tunnel syndrome were negative (Exhibit 5F/16-17). An abdominal sonogram done in July 2009 was normal (Exhibit 11F/44). Neurological exams were largely within normal limits with no problems noted with cognition or memory (Exhibits 5F/1, 11, 14-15[,] and 6F).

(*Id.*)

In assessing Plaintiff's RFC, the ALJ gave little weight to the non-examining opinions of State agency medical consultants Gary Carter, D.O. and Donald Morford, M.D., who found that Plaintiff could perform a reduced range of sedentary work. (*See* Tr. 1297; *see also* Tr. 704-11 (Physical Residual Functional Capacity Assessment by Dr. Carter dated May 13, 2009); Tr. 1005-12 (Physical Residual Functional Capacity Assessment by Dr. Carter dated December 18, 2009).) The ALJ explained that "the findings [related to] [Plaintiff's] neck and back are minimal, and they would not preclude a reduced range of light work"; rejected Plaintiff's alleged inability to lift or carry as "inconsistent with the conservative course of treatment that the claimant has received, as well as the objective findings"; and stated that Plaintiff's "physical examinations [were] also not consistent with a reported inability to lift." (Tr. 1297-98.)

---

symptoms may include a loss of the ability to feel extremes of hot or cold, especially in the hands. Some individuals also have severe arm and neck pain." *Id.*

The ALJ also gave little weight to the opinions of the State agency consultative medical examiner, Steven Dingfelder, Ph.D. (1298-1300.) The ALJ addressed Dr. Dingfelder's opinions, based on his June 15, 2019 clinical evaluation and mental status examination of Plaintiff, as follows:

> [During the examination], the claimant appeared to answer questions to the best of her ability, but had trouble remembering specific information, such as dosage of medications and specific dates of life events (Exhibit 9F/1). The claimant stated that she was an executive housekeeper at the Days Inn in St. Augustine Beach. [Her] [d]uties included managing other housekeepers, sweeping the parking lot, and cleaning up the breakfast bar (Exhibit 9F/2). The claimant stated that she usually got along with people at her work and was dependable—performing more than what was required (Exhibit 9F/3). The claimant also denied any history of mental health problems or treatment (Exhibit 9F/4).
>
> On mental status examination, the claimant was pleasant and agreeable[,] but her speech was pressured. Thoughts were logical, linear and goal directed. Concentration was reported as somewhat compromised. There was moderate indication of memory problems throughout the interview. The claimant reported that concentration and persistence [were] compromised by her preoccupation with chronic pain (Exhibit 9F).
>
> In his report, Dr. Dingfelder stated that the claimant's prognosis [was] guarded, noting:
>> ... Ms. Knight-Thieme reports and appears to be in pain, which is causing her considerable stress and anxiety. If her medical problems are corroborated from collateral information then she [genuinely] seems to be unable to perform duties or tasks of a physical nature that has been a big part of her previous work experience. In addition, she appears to have memory loss and reports some confusion or difficulty with comprehension and understanding what is said to her. Further neurological testing would be warranted to determine the nature of her impairment in that area. (Exhibit 9F/6).

(Tr. 1298.)

The ALJ continued:

> The undersigned notes that when asked by the clinician to explain
> why she is disabled, the claimant did not report mental health issues
> or reasons as a basis for disability, but rather, reported physical
> complaints such as stomach pain, back problems, uterine fibroids,
> and headaches. This is consistent with Dr. Dingfelder's consultative
> report observations, which note that the claimant was able to provide
> requested information to the mental health examiner without difficulty
> and that her memory was not very much impaired, as she could
> present a longitudinal work history, as well as the duties that were
> required as part of her various jobs.  While the claimant had trouble
> remembering specific information such as dosage of medications
> and specific dates of life events, and reported that concentration and
> persistence [was] compromised by her preoccupation with chronic
> pain[,] [t]he claimant was also able to relate her family history and
> important aspects of her life [] without noticeable difficulty. She also
> specifically denied any history of mental health problems or
> treatment (Exhibit 9F).

(*Id.*)

The ALJ rejected Dr. Dingfelder's opinions as based on Plaintiff's

"subjective statements regarding memory and concentration limitations, while the

report [did] not detail diagnostic or specific cognitive measures that were offered

to the claimant to support a significant level of compromise in the ability to

remember and concentrate, and secondary to pain as reported by the claimant."

(Tr. 1299; Tr. 798-803.)  The ALJ emphasized that Dr. Dingfelder's opinions were

based largely on Plaintiff's subjective complaints and that his conclusions

regarding her physical impairments were beyond the scope of his expertise.  (*Id.*)

The ALJ also noted that Dr. Dingfelder found Plaintiff had a slight cognitive

impairment, but could function within normal limits.  (*Id.*)  Thus, the ALJ

concluded:

the evidence [was] not fully consistent with the claimant's subjective complaints, or the opined level of severity indicated by Dr. Dingfelder in his consultative report. The undersigned also notes that Dr. Dingfelder did not diagnose a cognitive disorder but rather an anxiety disorder, [] despite the fact that his clinical exam did not disclose any anxiety type symptoms. Because Dr. Dingfelder's report is both contradictory and inconsistent with the overall evidence, only little weight can be accorded.

(Tr. 1299-1300.)[13]

The ALJ also gave limited weight to the State agency mental status assessments completed by Gary Buffone, Ph.D. and Jill Rowan, Ph.D., non-examining medical consultants. (Tr. 1300 (citing Tr. 862-79 (Dr. Buffone's July 22, 2009 Mental Residual Functional Capacity Assessment and Psychiatric Review Technique)[14]; Tr. 919-36 (Dr. Rowan's October 19, 2009 Mental Residual Functional Capacity Assessment and Psychiatric Review Technique)).) In making this determination, the ALJ found that there was an absence of "longitudinal objective evidence that the claimant had significant memory difficulties based on her interactions with her primary care physician, other treating and examining medical sources and the findings of the June 2009 psychological assessment." (Tr. 1300.) Additionally, the ALJ noted that the

---

[13] The ALJ noted that Plaintiff demonstrated only a mild cognitive impairment with a score of 25/28 on her 2010 and 2011 Mimi Mental Status Exams (MMSE). (Tr. 1300 (citing Tr. 1147-57).) However, it is uncertain whether the exam was administered multiple times or whether it was administered only once on November 4, 2010, since the test questions and scores are identical in each report, and were automatically included in subsequent medical reports. (Tr. 1147-57.)

[14] Dr. Buffone noted Plaintiff's GAF score of 50, denoting serious impairment, *e.g.*, unable to keep a job. (Tr. 878.)

MMSE results "showed only slight or mild cognitive impairment and there [was] no evidence [of] any 'moderate' problems in her memory, concentration or attention, as such would have been found by the Folstein MMSE testing." (*Id.*)

Next, the ALJ stated that although Plaintiff also saw Stephanie Epting, D.O. at the Florida Spine Care for back pain, "there were no significant findings" on exam, and concluded that Plaintiff received "a conservative treatment regimen of medication including Lortab and a muscle relaxer, with trigger point injections."[15] (*Id.*) The ALJ also assessed records from Bao T. Pham, D.O. with Florida Spine Care, and noted the following:

> Records from the Florida Spine Center and Dr. Bao Pham (a physiatrist)[16] show treatment for her musculoskeletal injuries sustained after her slip and fall accident (Exhibits 23F and 34F). Findings are generally consistent with soft tissue injuries treated successfully with injective therapy. The prescribed medications were noted to be controlling her pain with no adverse side effects. There are no significant physical exam findings and the notes are largely repetitive from one progress note to the next, further suggesting consistent pain control.

(Tr. 1301.)

---

[15] The record reflects that Plaintiff saw Dr. Epting on August 18, 2008 and July 21, 2009. (Tr. 883-88.) Dr. Epting diagnosed Plaintiff with lateral epicondylitis and cervicalgia and noted that, upon examination and palpitation of the cervical spine, the right mid-scapular region and right upper trapezius area was exquisitely tender. (Tr. 885, 887.) Dr. Epting's reports also noted decreased range of motion and an upper extremity exam of Plaintiff revealed spasm, tenderness, and trigger points, bilaterally. (*Id.*)

[16] The record shows that Dr. Pham administered Plaintiff's trigger point injections at Florida Spine Care between September 15, 2009 and August 18, 2010. (Tr. 885-88; Tr.1064-1103; Tr. 1301.)

In assessing the opinion evidence of Plaintiff's treating neurologist Mark K.

Emas, M.D., the ALJ stated as follows:

> In February 2009, the claimant presented to Dr. Mark Emas, a neurologist, for evaluation of injuries she sustained in an earlier July 2008 slip and fall at a dollar store (Exhibit 22F/39-42). She also complained of headaches and back and neck pain as well as some absence seizures. Neurological and musculoskeletal exams showed some minor findings but no substantial abnormalities; the claimant's medications were adjusted and additional testing ordered. A follow-up EEG was viewed as again mildly abnormal but no other problems were observed (Exhibit 22F/11, 38). No epileptiform activity was noted, and while possible etiologies could not be excluded, it was noted that the prominent beta activity identified during the study suggested an underlying medication effect. Multiple neurological exams performed by Dr. Emas demonstrate[d] the claimant's memory and recall to be intact, with her complaints appearing to be myofascial in nature relative to her musculoskeletal issues. The claimant's medication[s] [] prescribed by Dr. Emas, some of which were taken as needed, included Lortab, Fioricet, Naprosyn and Ativan.

> Dr. Emas' progress notes contain some inconsistencies. His own physical neurological exams show no recall or memory deficits but also indicate[d] that the claimant reported memory problems since her slip and fall accident at a dollar store on July 2, 2008. He suggest[ed] that further neuropsychological testing [was] recommended in May 2009, but state[d] that he and the claimant were unable to obtain such testing secondary to unspecified insurance reasons (Exhibit 22F/12, 28). However, both the recommendation and assessment [did] not appear entirely consistent with the MMSE performed at the June 2009 psychological assessment as detailed above, and Dr. Emas' objective neurological findings, which support[ed] no significant cognitive or mental impairment deficits. The claimant's "seizures" were better controlled on Dilantin. There is nothing to suggest that the claimant had an anxiety disorder other than the comments noted by Dr. Emas based on the claimant's subjective reports.[17] For example, the claimant []

---

[17] On November 5, 2009, Dr. Emas diagnosed Plaintiff with, *inter alia*, "[p]ost-traumatic anxiety disorder secondary to the fall on 07/02/08" and stated that Plaintiff

sought no ongoing mental health counseling for any such anxiety
issues during the time period at issue, and as indicated previously,
there is nothing in his own progress notes to suggest any cognitive
dysfunction. . . .

(Tr. 1300-01.)

The ALJ then noted that a neurological assessment conducted by Dr.

Machado in November 2010 was "largely within normal limits" and concluded that

"[t]here [were] no further notes from this evaluating source indicating further

treatment concerning her Arnold-Chiari I malformation, further establishing

satisfactory management of symptoms."[18]  (Tr. 1301.)  Although not an

acceptable medical source, the ALJ also assessed the opinions of Joanne Puleo,

ARNP, with the Primary Care Center at Flagler Hospital, that Plaintiff was totally

disabled and unable to participate in any meaningful or gainful employment, but

gave these opinions little weight as based on Plaintiff's subjective complaints and

as inconsistent with the overall medical evidence.[19]  (Id.)

The ALJ also evaluated the medical opinions of Kenneth Cloninger, a

testifying medical expert and board-certified neurosurgeon who testified at

Plaintiff's hearing on October 19, 2010.  (Id.)  The ALJ gave great weight to Dr.

_____

"continue[d] to have increased anxiety, which seem[ed] to revolve around her pain,
cognitive dysfunction and limitations thereof."  (Tr. 1033, 1022.)

[18] However, the record actually reflects that on November 23, 2010, Dr. Machado
referred Plaintiff to see another specialist for her Arnold-Chiari I malformation and
syrinx, discussed *infra*.  (*See* Tr. 1119-21.)

[19] In a letter dated March 29, 2012, ARNP Puleo noted that Plaintiff's symptoms
were possibly being caused by her Arnold Chiari Type I malformation and associated
syrinx, for which she needed surgery.  (Tr. 1232.)

Cloninger's opinions that Plaintiff could perform a reduced range of light exertional work because the doctor "offered a cogent medical rationale, and the evidence of record supports his stated findings, which are consistent with the claimant's treatment records, objective and diagnostic findings, course of conservative treatment and overall evidence as discussed herein." (*Id.*)

The ALJ then evaluated the medical opinions of Dr. Baptiste-Boles, a State agency examining psychologist, but rejected her opinions regarding Plaintiff's work limitations as being based on testing performed in 2013, "two years and five months after the date last insured[,]" and based on "symptoms of depressed mood, [low] energy, and anhedonia, which were established as mild during the adjudicative period through the date last insured." (*Id.*)  The ALJ also found that the increased limitations opined by Dr. Baptiste-Boles were consistent with a decline in Plaintiff's functioning after the date last insured and after 2012, which, the ALJ concluded, was consistent with MMSE testing in 2009, 2010, and 2011, which demonstrated "only a mild cognitive impairment."   (Tr. 1305 (citing Plaintiff's MMSE score of 25/28 where "a score of 23 or lower would be indicative of a cognitive impairment").)  The ALJ accorded only partial weight to Dr. Baptiste-Boles's medical opinions because "they appear[ed] to be largely based upon evidence obtained after the date last insured and subjective complaints that are not entirely consistent with the overall evidence through the date last insured." (*Id.*)  The ALJ gave significant weight to Dr. Baptiste-Boles's diagnoses established prior to the DLI and accorded little weight to "other opinions,

including the opined severity of the impairments that are inconsistent with the evidence as of the date last insured."  (*Id.*)

The ALJ also pointed to apparent inconsistencies in Dr. Baptiste-Boles's reports, including an apparent inconsistency between Plaintiff's GAF score of 59 and Plaintiff's unremarkable mental status examination.  (*Id.*)  The ALJ also reasoned that a GAF score of 59 was not consistent with a "marked" limitation in Plaintiff's "ability to understand, remember and carry out complex instructions as well as to make judgments on work related decisions."  (*Id.*)  Moreover, the ALJ noted that Plaintiff had "not received the type of mental health treatment one would expect for a disabled individual, or an individual with significant mental health symptomology during the adjudicative period through the date last insured."  (*Id.*)  The ALJ also pointed to Dr. Baptiste-Boles's observation that "[t]here was no reported impact of current mental health symptoms on being able to return to work."  (*Id.*)

The ALJ then assessed Dr. Rabin's opinions, but accorded them little weight because "[t]he overall longitudinal evidence [did] not support the hearing testimony or opined severity of limitations of the written Mental Residual Functional Capacity (RFC)" offered by Dr. Rabin after the hearing.  (*Id.*)  The ALJ found:

> The overall evidence of record consistently demonstrated only a mild cognitive impairment that has not been impacted to a disabling degree by psychosomatic or other mental impairment factors or symptoms during the adjudicative period through the date last insured. These findings have been consistent across multiple

examiners, and across a wide variety of medical specialties, including general family practice, neurology, gastroenterology and clinical psychology. While the mental status evaluation done by the consultative examiner in 2013 shows a progression in symptoms (and since 2012 records received from Stewart Marchman), these findings occurred years after the date last insured in 2010. The 2013 findings were also noted to be secondary to memory problems and symptoms such as depressed mood, energy and anhedonia, which are not established by the evidence as significant issues through the date last insured as discussed above herein. ([S]ee Exhibit 40F).

(Id.)

The ALJ concluded that Plaintiff's mental symptomology was not supported for the adjudicatory time period and that her pain was well-controlled. (Tr. 1307.) The ALJ found that Plaintiff was "able to work within the limitations in the above residual functional capacity."[20] (Id.) The ALJ also noted that she had accounted for Plaintiff's impairments by limiting Plaintiff to a reduced range of light exertion work, but that the evidence did not support any further limitations.[21] (Id.) In sum, the ALJ concluded that the RFC was "supported by the course of conservative treatment, results of diagnostic testing, neurological and

---

[20] The ALJ also gave little weight to the medical opinion of Manley W. Kilgore, II, M.D., P.A., Plaintiff's treating neurologist, that "claimant had not reached maximum medical improvement and [was] unable to work." (Tr. 1307; see also Tr. 676, 682, 684.) The ALJ reasoned that Plaintiff's "medical complaints [had] been treated conservatively and the record indicate[d] that the claimant's pain complaints ha[d] been managed with medication." (Id.) The ALJ also noted that Plaintiff received treatment for musculoskeletal injuries sustained after a fall and that these finding were "generally consistent with soft tissue injuries treated conservatively with injective therapy." (Id.)

[21] The ALJ also found that medical records from 2014-2016 had no bearing on Plaintiff's functioning during the adjudicative period and, thus, accorded them little weight and only considered them for longitudinal history purposes. (Tr. 1307.)

musculoskeletal assessments, examination findings, and the overall evidence for the reasons discussed herein." (*Id.*)

The ALJ then determined that, based on the testimony of the vocational expert ("VE"), Plaintiff was capable of performing her past relevant work as a cleaner and that this work did not require Plaintiff to perform work-related activities precluded by the RFC. (*Id.*) In the alternative, at step five, the ALJ found that there were other jobs in the national economy that Plaintiff could perform. (Tr. 1308.) Based on Plaintiff's age, education, work experience, RFC, and VE testimony, the ALJ found that Plaintiff could perform light unskilled work (such as a laundry folder, inspector and hand packager, and electronics worker) and that this work existed in significant numbers in the national economy. (Tr. 1308-09.) Thus, the ALJ found that Plaintiff was not disabled at any time from March 30, 2006, the alleged onset date, through September 30, 2010, the date last insured. (Tr. 1309.)

### D. Analysis

Here, Plaintiff argues that the ALJ failed to properly credit the opinions of Dr. Rabin, a testifying psychological expert, and Dr. Baptiste-Boles, an examining psychologist. Specifically, Plaintiff argues that the ALJ improperly relied on "his lay analysis of the raw medical data, and asserted 'inconsistencies' in the evidence, to which Dr. Rabin explicitly responded, to deny benefits." (Doc. 16 at 24-25.) Plaintiff further argues that the ALJ's reasons for discrediting the opinion of Dr. Rabin, and the opinion of Dr. Baptiste-Boles by extension, mainly that they

were offered outside the adjudicative period and that the opinions were inconsistent, were flawed and constitute a reversible error. (*Id.* at 22-25.) Plaintiff also argues that the ALJ erred by failing "to include all of the mental limitations identified by the record" in the RFC. (*Id.* at 20.) Based on a review of the record as a whole, the Court agrees with Plaintiff that a remand is necessary.

In giving little weight to Dr. Rabin's opinions, the ALJ found that "[t]he overall longitudinal evidence did not support the hearing testimony or opined severity of limitations of the written Mental Residual Functional Capacity (RFC) for this expert witness . . . . The overall evidence of record consistently demonstrated only a mild cognitive impairment, that had not been impacted to a disabling degree by psychosomatic or other mental impairment factors or symptoms during the adjudicative period through the date last insured." (Tr. 1306.) As the record demonstrates, Dr. Rabin correlated Plaintiff's psychological and mental impairments with her pain and Arnold-Chiari I malformation, and specifically opined that that Plaintiff's impairments, in combination, would preclude Plaintiff from being able to complete an 8-hour workday and a 40-hour workweek.[22] (*See* Tr. 1516; *see also* Tr. 1519-20.) The ALJ's conclusion that Plaintiff's pain, Arnold-Chiari I malformation, and possible syrinx were

---

[22] In considering only some of the restrictions identified by Dr. Rabin, the VE testified that all work would be eliminated if Plaintiff was unable to "remember work-like procedures, maintain regular attendance and be punctual with customary standards, tolerances, and perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in a routine work setting" for up to 20 percent of a work day. (Tr. 1337.)

satisfactorily managed is not supported by substantial evidence. (Tr.1301,

1307.) The ALJ determined that Plaintiff's Arnold-Chiari I malformation and

syrinx were satisfactorily controlled based on lack of notes from Dr. Machado.

However, in November 2010, Dr. Machado actually referred Plaintiff to a

neurosurgeon, but, due to lack of insurance and funds, Plaintiff was unable to

see the neurosurgeon.[23] (Tr. 1119-21, 1127.) Plaintiff also consistently

complained to her medical providers of severe headaches and debilitating pain,

despite receiving palliative treatment.[24] Moreover, the record consistently

---

[23] On November 23, 2010, Dr. Machado informed Dr. Perumal and PCC, the referring medical provider, of his findings with respect to his examination and evaluation of Plaintiff, as follows:

> The patient has many symptoms that start with neck pain and occipital pain, which radiates to the upper extremities. She feels "pressure in the head" and when she lays down[,] the pressure gets worse.
> …
> Impression
> I have reviewed the MRI of the cervical spine and brain, both of which show[] an Arnold Chiari Malformation, with evidence of syringomyelia, very high in the cord at the level of C1, C2. Whether this represents a syrinx, is questionable.
> Recommendations
> *This patient needs to be evaluated in Gainesville and I have made a referral to Dr. Friedman.*

(Tr. 1119-21 (emphasis added).) Rather than establish that Plaintiff's conditions were "within normal limits," as noted by the ALJ (Tr. 1301), this evidence showed that Plaintiff needed further evaluation.

[24] While the record states that "[t]he pain medications [were] controlling the patient's pain well with no noted side effects or problems," Plaintiff still presented with complaints of increased pain. (*See, e.g.*, Tr. 1064 (noting Plaintiff's June 15, 2010 complaints of an "increase in shoulder pain and burning sensation in her T spine," stating "the highest pain level since [the] last visit was 10 out of 10, and the lowest was 8 out of 10," and complaining of "intermit[ent] shooting pain in her [l]umbar spine shooting upwards toward her [c]ervical [s]pine" and [] a headache for 15 days straight).)

showed that Plaintiff had difficulty obtaining adequate medical care during the adjudicative period, and afterwards, due to lack of medical insurance and lack of funds.[25]

To the extent the ALJ rejected Dr. Rabin's and Dr. Baptiste-Boles's opinions because they were issued after the DLI, these opinions appear to be highly relevant to Plaintiff's disability determination because the lack of insurance delayed or impeded adequate medical testing and treatment during the adjudicative period.[26]  *See Lingenfelser v. Comm'r of Soc. Sec.*, No. 6:16-cv-921-Orl-DCI, 2017 WL 4286546, at *7 (M.D. Fla. Sept. 27, 2017) ("When determining whether a claimant is disabled, an ALJ should consider evidence postdating an

---

[25] The record contains numerous references to Plaintiff's lack of insurance and financial difficulties, which impeded adequate medical treatment. (*See, e.g.*, Tr. 1033 (Dr. Emas's November 5, 2009 report noting: "Suspected partial complex seizure disorder with left cerebral focus occurring after the fall on 07/02/08. The patient continues to have intermittent periods of decreased responsivity. The patient has been taking Dilantin, although I discussed my concern that she has not had any blood work. The patient and her husband are aware that Dilantin can cause liver and bone marrow toxicity with risks of morbidity and mortality with this. The patient was to follow up with a local lab to see how much money it would take to have her drug level and blood work performed. I discussed my concern that she may not be able to continue the medication if we are not able to monitor her blood levels or at least CBC and chemistry profile."); Tr. 1022 (Dr. Emas's May 24, 2010 notes stating that Plaintiff "was scheduled to have neuropsychological testing; however, this could not be performed secondary to insurance reasons"); *see also, e.g.*, Tr. 502-03 (noting that Plaintiff's husband cared for her and that they often lacked funds for her medical care, including needed MRI and CAT scans, as they survived only on his disability benefits of $904 per month); Tr. 621 (noting, on February 13, 2006, that a medically recommended colonoscopy was cost-prohibitive).)

[26] Additionally, Dr. Rabin specifically noted that his opinions were based on his evaluation of the medical evidence for the adjudicative period (Tr. 1479-80), and that Dr. Baptiste-Boles's evaluation supported his conclusion that Plaintiff would "have great difficulty staying on task for a full 40-hour workweek." (Tr. 1515-16.)

individual's date of last insured as it may be relevant so long as it bears 'upon the severity of the claimant's condition before the expiration of his or her insured status.'").

Of note, the medical treatment records reflect that by 2012, Plaintiff had been diagnosed with brain compression in connection with her Arnold-Chiari I malformation and it had been determined that she required surgery, but was unable to obtain this treatment due to lack of insurance and funds.[27]  (*See* Tr. 1264; *see also* Tr. 1618 ("Refilled tramadol/butalbital[.]  [W]e are left with really no choice but to continue filling this [patient's] [medications] while she is awaiting appeal, as she is in intractable pain."); Tr. 1622 ("Again advised [patient] of the life threatening seriousness of Arnold-Chiari malformation, and that her pain and cough is coming from compression of her brain, and she needs to see neurosurgery ASAP.  Patient was advised to go immediately to the Emergency Department with severe headache or altered mental status.  [P]atient is unable to get any help from social services and is awaiting disability[;] we will refill [her medications] again."); Tr. 1273 ("Again advised [patient] [of] the serious nature of Arnold-Chiari and her pain and symptoms such as coughing every 10 seconds

_____

[27] In a letter dated March 29, 2012, ARNP Puleo noted that Plaintiff had been a patient since June 2009.  (Tr. 1232.)  Ms. Puleo noted that that Plaintiff had been diagnosed with Arnold Chiari Type I malformation with an associated syrinx of the cervical spinal cord and that this condition was suspected of being the cause of Plaintiff's "frequent and debilitating cephalgia, cervical radiculopathy, degenerative disc disease of the cervical spine, altered sensation including pain and numbness in her upper extremities, extreme fatigue, and emotional lability."  (*Id.*)

are all likely resulting from brain compression.  Advised [patient] to go to ED if any symptoms worsen.  Advised [patient] pain meds may not be the best idea[,] but all we can do while waiting for her disability, as the neurosurgery voucher has been denied by social services, is treat her symptoms . . . .").)

In giving only partial weight to Dr. Baptiste-Boles's opinions, the ALJ found that "they appear[ed] to be largely based upon evidence obtained after the date last insured and subjective complaints that [were] not entirely consistent with the overall evidence through the date last insured."  (Tr. 1305.)  The ALJ discounted Dr. Baptiste-Boles's opinions regarding Plaintiff's work limitations as being based on testing performed in 2013, "two years and five months after the date last insured[,]" and based on "symptoms of depressed mood, energy, and anhedonia, which were established as mild during the adjudicative period through the date last insured."  (*Id.*)  Moreover, in rejecting Dr. Baptiste-Boles's opinions, the ALJ noted that Plaintiff had "not received the type of mental health treatment one would expect for a disabled individual, or an individual with significant mental health symptomology during the adjudicative period through the date last insured."  (*Id.*)

However, the ALJ's reasoning is not supported by substantial evidence where the overall medical record for the period in question reflects that Plaintiff suffered from mental and emotional impairments, her medical providers prescribed medications for her mental health symptoms, and that Plaintiff was uninsured and had difficulty obtaining medical care due to lack of financial

resources. (*See, e.g.*, Tr. 1023 (noting a May 24, 2010 referral to a psychologist for anxiety); Tr. 1028 (noting, on January 5, 2010, Plaintiff's prescription for Cymbalta for depression and chronic pain was filled and noting that Plaintiff experienced severe depressive symptoms, including insomnia, anorexia, anhedonia, reclusiveness, and emotional lability since her mother's death); Tr. 1033 (citing a November 5, 2009 prescription for Ativan to treat Plaintiff's anxiety); Tr. 1049 (noting, on May 18, 2009, Plaintiff's difficulties with memory and concentration and recommending neuropsychological testing); *see also* Tr. 688 (treatment notes from Dr. Kilgore dated August 27, 2008 and noting Plaintiff's "mood and personality changes, irritability, [and] flying off the handle [without] provocation").) Thus, the undersigned finds that the ALJ's reasons for discounting Dr. Baptiste-Boles's medical opinions related to Plaintiff's mental limitations are not supported by the record as a whole.

In sum, the ALJ's reasons for discounting Dr. Rabin's and Dr. Baptiste-Boles's opinions are not supported by substantial evidence. "The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam); *see also* SSR 96-6p (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources). While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not

ignore these opinions and must explain the weight given to them in his decision. SSR 96-6p. However, as shown above, the ALJ failed to adequately consider the medical evidence as a whole in rejecting or assigning little weight to the medical opinions of Dr. Rabin and Dr. Baptiste-Boles, State agency experts.

Accordingly, it is **ORDERED**:

1. The Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this Order, pursuant to sentence four of 42 U.S.C. § 405(g) with instructions to the ALJ to: (a) reconsider the opinions of Dr. Rabin and Dr. Baptiste-Boles in light of the record as a whole; (b) re-evaluate Plaintiff's RFC assessment, if necessary; and (c) conduct any further proceedings deemed appropriate.

2. The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3. In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012). This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** in Jacksonville, Florida, on September 25, 2019.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record